RENDERED: MARCH 14, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0559-MR

JOHN BRANDON LAMOTTE      APPELLANT

v.
APPEAL FROM FRANKLIN CIRCUIT COURT
HONORABLE PHILLIP J. SHEPHERD, JUDGE
ACTION NO. 17-CR-00111

COMMONWEALTH OF KENTUCKY      APPELLEE

AND

NO. 2020-CA-1486-MR

JOHN BRANDON LAMOTTE      APPELLANT

v.
APPEAL FROM FRANKLIN CIRCUIT COURT
HONORABLE PHILLIP J. SHEPHERD, JUDGE
ACTION NO. 17-CR-00111

COMMONWEALTH OF KENTUCKY      APPELLEE

<u>OPINION UPON REHEARING</u>
<u>REVERSING AND REMANDING</u>

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ACREE AND MCNEILL, JUDGES.

ACREE, JUDGE: In *Lamotte v. Commonwealth*, No. 2019-CA-0559-MR, 2023 WL 4982156 (Ky. App. Aug. 4, 2023) (hereinafter *Lamotte 1*), this Court consolidated the direct appeal of Brandon Lamotte's conviction for first-degree assault, KRS[1] 508.010(1)(a), with the appeal of the Franklin Circuit Court's denial of his motion for CR[2] 60.02 post-conviction relief. We reversed the conviction because the record lacked sufficient evidence to support a reasonable juror's conclusion beyond reasonable doubt that Lamotte inflicted serious physical injury, as KRS 500.080(15)[3] defines it, upon the victim, Kate Sanders. We did not address the order denying Lamotte post-conviction relief.

After we rendered *Lamotte 1*, the Commonwealth filed a petition for rehearing alleging the Court "overlooked several material facts that were in the record and evidence presented to the jury." (Pet. for Reh., at 2.) The Commonwealth acknowledges the evidence it references – the trial exhibits – was

---

[1] Kentucky Revised Statutes.

[2] Kentucky Rules of Civil Procedure.

[3] Since Lamotte's trial, the General Assembly amended KRS 500.080, including subsection (15), renumbering it as KRS 500.080(19). However, the substantive definition applicable to Lamotte and Kate has not changed.

not part of the certified record originally presented to this Court for review. Although neither party's brief cited any trial exhibit, the Commonwealth sought to resurrect the record, and thereby its responsive briefing, by filing an unusual post-rendition motion to supplement.

We reluctantly granted both the petition and the motion. Before setting out the Background in Section II, we address that motion and the reasoning behind our decision to grant it in Section I.

In Section III, with a more complete record before us, we again review and analyze these appeals. We specifically consider what the Commonwealth deems controlling authority, and all the evidence it erroneously asserts the Court overlooked.

Following our re-review, we reverse the judgment of conviction.

I. **CERTIFIED RECORDS ON APPEAL, THE SUPPLEMENTED RECORD IN THIS APPEAL, AND THE SHARED RESPONSIBILITY FOR ASSURING A COMPLETE RECORD**

We begin by addressing the Commonwealth's argument it is entitled to rehearing because of the alleged incompleteness of the certified record, and we do so by category of evidence. Those categories are: (1) evidence in the original record on appeal but which the Commonwealth believes this Court overlooked; (2) evidence required by rule to be made a part of the certified record on appeal, but which the circuit clerk failed to include or certify; and (3) documents printed from

a CD-ROM for the first time after this Court rendered *Lamotte 1*. In summary, here is how we address each category.

As we explained in *Lamotte 1* and as we will explain again, we did not overlook the evidence in category (1). That evidence *was* in the record.

Next, we reluctantly supplement the record with trial exhibits identified in category (2). We do so despite the fact the Commonwealth's brief never cited those exhibits. This effectively grants the Commonwealth an undeserved second opportunity to bring those records to our attention. We do so only because the jurisprudence indicates this Court has some measure of duty to assure a complete certified record on appeal, although certainly not in equal measure with the parties or the circuit clerk. *Commonwealth v. Woods*, 657 S.W.3d 902, 907 n.4 (Ky. 2022) ("where the record is incomplete, the best course of action is for that court to supplement the record *sua sponte*"). We are also motivated by the fact the trial exhibits further support our original analysis and decision to reverse the conviction. That evidence *should have been* in the record.

The category (3) documents were never presented to the jury and could not have influenced its decision to convict. We will only discuss those documents to the extent necessary to address the Commonwealth's arguments on rehearing. That evidence *was never* in the record.

-4-

Parties sometimes forget the importance, and the limitations, of the certified record on appeal. "Except for matters of which the appellate court may take judicial notice," the certified record is the entire universe of facts upon which appellate review is based. RAP[4] 32(E)(1)(c) (adopting language of superseded rule, CR 76.12(4)(c)(vii)). When that record is incomplete, "meaningful review by us is hampered . . . ." *Graves v. Commonwealth*, 283 S.W.3d 252, 256 (Ky. App. 2009). This is why our Supreme Court said, "[W]e implore attorneys engaged in practice before the appellate courts to ensure they have provided a complete record for our review." *Commonwealth v. Woods*, 657 S.W.3d 902, 906 n.3 (Ky. 2022). That admonition was not limited to attorneys representing appellants.

The Commonwealth's petition and motion to supplement the record with category (3) records – those never in the record – implicates a different admonition. No matter the pleas of the parties, appellate courts have "no authority . . . to incorporate new proof into the record." *Travelodge Int'l, Inc. v. Ky. Unemp't Ins. Comm'n*, 710 S.W.2d 232, 234 (Ky. App. 1986).

1. *Evidence the Commonwealth believes the Court overlooked* (Category (1)).

The Commonwealth correctly points out in its petition that, when deciding *Lamotte 1*, the Court labored under "an apparent misunderstanding regarding the record[,]" (Pet. for Reh. at 2), when we said:

---

[4] Kentucky Rules of Appellate Procedure.

The Commonwealth's citations to the record for support that [Kate] "suffered a substantial risk of death" appears on page 12 of its brief; specifically, the citations are to Volume II, pages 266, 268, and 271 of the certified record. But these citations are not to medical records. Rather, they are three separate pages of the transcript of the police interrogation of Chase Dugas [Kate's ex-boyfriend].

*Lamotte 1*, 2023 WL 4982156, at *5.

Perhaps because the consolidated appeals were advocated by two independent sets of advocates,[5] those two assistant attorneys general discovered, and informed the Court after rendition, that the circuit clerk had prepared two separate certified records for the separate appeals of the single judgment. This means the record on appeal included two Volumes II and two pages numbered 266, 268, and 271, respectively. The author of this Opinion and of *Lamotte 1* failed to discover this on behalf of the Court before rendering the Opinion and accepts responsibility for that failure, notwithstanding such failure has no effect on our former analysis or upon this one.

If only to clarify, however, we note that RAP 26(C) says:

---

[5] In the direct appeal, No. 2019-CA-0559-MR, Assistant Public Advocate Roy Durham represented Lamotte and Assistant Attorney General M. Brandon Roberts represented the Commonwealth. In the appeal of the denial of Lamotte's CR 60.02 motion, Amy Robinson Staples of The Exoneration Project and Whitney Wallace of The Kentucky Innocence Project represented Lamotte and Assistant Attorney General Joseph A. Beckett represented the Commonwealth. Lamotte's counsel in the second appeal knew there were two records all along as is readily seen in their brief's "Statement Concerning Citation to the Record." Because our focus was drawn to the direct appeal in *Lamotte 1*, the author of that Opinion, and this, overlooked that notation and acknowledges the error, albeit harmless.

> **Several appeals.** When more than one appeal is taken to an appellate court from the same judgment, *a single record on appeal* shall be prepared containing all the matter designated or agreed upon by the parties, without duplication.

(Emphasis added.) The rule is also made a part of the *Kentucky Circuit Clerks Court Manual* (hereinafter *Manual*) that says: "If more than one appeal is filed from the same judgment, prepare one record on appeal." *Manual*, Section 4.1.10.

"[A] motion under CR 60.02 or RCr[6] 11.42 to vacate or modify a judgment is a continuation or re-opening of the same proceeding that culminated in the judgment under attack." *Fanelli v. Commonwealth*, 423 S.W.2d 255, 257 (Ky. 1968). Such motions differ from what they replaced – a separate civil action commenced independently to petition a court for a common law writ of *coram nobis*. *Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky. 1983). Although the denial of a CR 60.02 collateral attack on the judgment remains appealable just as it was under *coram nobis*, it neither commences a new action under CR 3 nor results in a judgment independent from the judgment it collaterally attacks.

Old habits may be hard to break. In 1968, when "the rules d[id] not make clear what is 'the entire record' in a CR 60.02 or RCr 11.42 motion proceeding . . . circuit clerks consider[ed] the record as a new one, beginning with the motion." *Fanelli*, 423 S.W.2d at 257. The rules now make it clear. We urge

---

[6] Kentucky Rules of Criminal Procedure.

the Franklin Circuit Court and the Franklin Circuit Clerk to have the deputy clerk responsible for preparing certified records for appeal review these rules.

Perhaps contributing to the circuit clerk's confusion is the fact that the trial record on the direct appeal was already certified and lodged with the Clerk of the Court of Appeals when Lamotte filed his CR 60.02 motion. The record then consisted of Volumes I through III and was paginated 1 through 361. The record necessarily grew as a result of the post-conviction proceeding. But instead of creating Volume IV beginning with page 362, the circuit clerk started anew with a second Volume I beginning with a second page 1 and ending with Volume V, page 761. When the Commonwealth cited pages from Volume II, *Lamotte 1*'s author mistakenly viewed the second Volume II created from the CR 60.02 proceeding.

However, this does not mean the Court failed to review the medical records the Commonwealth intended us to see. As we said in *Lamotte 1*:

> Our examination of the record revealed medical records to which the Commonwealth might have intended to direct us. However, those medical records reveal only evidence of the superficiality of Sanders' wounds and the coincidental treatment two days later for Sanders' chronic, pre-existing pneumothoracic condition.

*Lamotte 1*, 2023 WL 4982156, at *12. We were referring then to the medical records in the post-conviction certified record, Second Volume I at pages 112, 114, and 117. These pages are identical to those the Commonwealth cited as First Volume II at pages 266, 268, and 271, certified soon after the judgment of

-8-

conviction. Therefore, the Commonwealth is mistaken in its charge that we failed to consider this evidence.

This evidence identifies portions of Lamotte's pre-trial filing of a proposed exhibit of Kate's medical records, but not the trial exhibit itself. Not only did we consider this evidence, but we also relied on faith that Lamotte actually introduced the exhibit and the jury actually saw it despite the Commonwealth's failure to cite to the record establishing that fact, and despite the circuit clerk's failure to include the exhibits in the record on appeal.

Now that we supplemented the record with the trial exhibits, we need not rely on faith. The pages the Commonwealth cites – First Volume II, pages 266, 268, and 271 – correspond to Defendant's Exhibit 5, pages 4, 6, and 9 – an exhibit the jury did see.

We know now that Lamotte introduced this exhibit as proof that on the day Kate first identified Lamotte as her assailant – two days after she sustained her injuries and contemporaneously identified Chase Dugas as her perpetrator – she had undergone surgery after being anesthetized and was prescribed psychotropic drugs post-surgery to control the pain. We know now that the Commonwealth did introduce some of the same medical records; however, its brief cites none of the exhibits as support for the jury's finding of "serious physical injury."

2. *Evidence the circuit clerk should have certified and included in the record but did not.*

It is only in its petition for rehearing that the Commonwealth first notes to the Court the circuit clerk's failure to include trial exhibits in the certified record. In a footnote, the Commonwealth says:

> The current record indicates that multiple exhibits were introduced at trial, which included [Commonwealth's] Exhibit 81 containing printed medical records and a CD with over 1,300 pages of medical records regarding injuries to the victim. [citation to current record omitted]. Those medical records were not referenced in the Court's opinion [*Lamotte 1*], because they were not, along with other trial exhibits, transmitted to the Court of Appeals record, causing material facts to be overlooked when deciding this case.

(Pet. for Reh, at 3 n.3.) The material facts reviewable by an appellate court are those found in a record. The Commonwealth's post-rendition motion to supplement the record acknowledges that "exhibits submitted to the jury (namely medical records) . . . did not make their way to the Court of Appeals record." (Mot. to Supp. Record, at 2.) If not in the record, as these exhibits were not in the record, it is impossible for the Court to have overlooked them.

As the Commonwealth points out, the appropriate rule, RAP 26(B)(3), effectively instructs the circuit clerk that "[a]ll exhibits such as documents, maps, photographs, and other papers reasonably capable of being enclosed in legal-sized envelopes, shall be transmitted to the appellate court." That did not occur here.

Notwithstanding the circuit clerk's error, we question whether this Court improvidently granted the Commonwealth's motion to supplement the record with these trial exhibits. This is because supplementing the record after rendering the opinion is such a rare thing. And so it should be.

On one hand, we know of nothing depriving the Court of authority to supplement a record even after an opinion's rendition other than the law's strong interest in finality. *Cf. Pendleton v. Centre Coll. of Ky.*, 818 S.W.2d 616, 619 (Ky. App. 1990) ("After an estate has been finally distributed, the interest in finality may provide an additional, valid justification for barring the belated assertion of claims, even though they may be meritorious and even though mistakes of law or fact may have occurred during the probate process.") (quoting *Reed v. Campbell*, 476 U.S. 852, 855-56, 106 S. Ct. 2234, 2237, 90 L. Ed. 2d 858 (1986)). Yet on the other hand, this strong interest in finality militates against supplementing at such a late stage except under extraordinary circumstances evoking a deeply just need.

One factor to be considered in this case is whether the Commonwealth had an earlier opportunity, and even the duty, to move to supplement the record prior to its own briefing. We start with that opportunity.

According to this Court's record in the direct appeal, on May 6, 2019, the Franklin Circuit Clerk served the Commonwealth with a copy of its Certification of Record on Appeal which clearly shows zero "Envelope(s) of

-11-

Exhibits."[7]  The circuit clerk then transmitted the physical certified record with no exhibits to the Clerk of the Court of Appeals having notified the Commonwealth the trial exhibits were *not* included.

On November 12, 2019, the assistant attorney general assigned to prepare the brief checked out and took possession of the physical record.  On January 10, 2020, he sought an enlargement of time and certified, pursuant to *Caldwell v. Commonwealth*, 157 S.W.3d 215 (Ky. App. 2004), that he had examined the certified record.  *Caldwell* requires more than the Commonwealth's "cursory" look at the record; it "presupposes an examination sufficient to enable counsel to request an adequate amount of additional time in which to prepare the brief."  *Id.* at 223 n.5 ("Compliance with this requirement will be enforced.").

On March 6, 2020, the assistant attorney general sought a second enlargement of time and made the same representation to this Court that he had examined the certified record.

On December 3, 2020, nearly thirteen (13) months after taking possession of the certified record, the assigned assistant attorney general representing the Commonwealth filed his brief, certifying the record had been returned to the Clerk of the Court of Appeals.  His brief cites no trial exhibits.

---

[7] Commonwealth's Attorney Larry Cleveland prosecuted the case against Lamotte and opposed Lamotte's CR 60.02 collateral attack on the judgment of conviction.  These notices from the clerk were sent to him.

On January 12, 2021, after Lamotte's CR 60.02 motion was denied, he appealed. The Franklin Circuit Clerk certified the post-conviction portion of the record, again noting *no trial exhibits* were included in the certified record sent to this Court's Clerk. That certification was served on the Commonwealth again.

A different assistant attorney general was assigned to prepare an appellee's brief in that second appeal. He checked out the certified record from the Court of Appeals on August 24, 2021. On October 20, 2021, counsel for the Commonwealth filed a motion in that appeal for an enlargement of time. As *Caldwell*, *supra*, requires, that second assistant attorney general represented that he examined the certified record before making the motion. On December 27, 2021, having had the record in his possession for four (4) months, he returned it to the Clerk of the Court of Appeals. His brief made no reference to any trial exhibit.

Therefore, for a combined seventeen (17) months, the appellate advocates representing the Commonwealth were in possession of this record with unfettered access and were duty-bound to examine it. Neither of the Commonwealth's advocates cited any trial exhibit or objected to their absence from the record until after this Court rendered *Lamotte 1* reversing the conviction. So, to use the Commonwealth's verbiage, before it claimed this Court "overlooked [material facts] when deciding the case[,]" (Pet. for Reh. at 3 n.3), the Commonwealth itself first overlooked them when briefing the case.

-13-

We already acknowledged the clerk of the circuit court bears the responsibility of including trial exhibits in the certified record. However, that does not mean the appellee in an appeal – in this case, the Commonwealth – bears no responsibility for assuring the appellate court has a complete record. Before addressing that responsibility, we briefly discuss a somewhat recent Kentucky Supreme Court opinion, *Commonwealth v. Woods*, cited *supra*.

In *Woods*, the Supreme Court dealt with its own incomplete-record dilemma. 657 S.W.3d at 906. The Court said: "In appellate cases where the record is incomplete, the best course of action is for that court to supplement the record *sua sponte* . . . . [citations omitted]. If the appellate court does not take such action, then [*Commonwealth v. *]*Thompson*[, 697 S.W.2d 143, 145 (Ky. 1985)] controls and the court must assume the omitted portion of the record supports the trial court's decision." *Woods*, 657 S.W.3d at 907 n.4.

That simple procedural rule is sound enough to apply in many, likely most, appeals. However, when a defendant asserts the record made by the Commonwealth's proof was insufficient to support one or more elements of a crime and the trial court denies a directed verdict, constitutional questions arise. The United States Constitution "mandates the government must prove every element of the charged offense beyond a reasonable doubt." *Anderson v. Commonwealth*, 352 S.W.3d 577, 581 (Ky. 2011) (citing *In re Winship*, 397 U.S.

358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)); *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002); KRS 500.070(1)). "Failure to do so violates the accused's right to Due Process." *Anderson*, 352 S.W.3d at 581 (citation omitted).

The conflict is obvious. We cannot substitute an appellate procedural rule for the Due Process Clause's requirement of proof beyond a reasonable doubt when the argument on appeal is precisely that the record lacks such evidence. That is where another Kentucky Supreme Court opinion comes in, establishing the appellee's duty.

Not so long before *Woods* and long after *Thompson* which *Woods* cites, our Supreme Court said, "When an appellant has designated part of the record for appeal that is sufficient to support a conclusion of error by the trial court, the appellee must also designate portions of the record in support of her position." *Mifflin v. Mifflin*, 170 S.W.3d 387, 389 (Ky. 2005). A year later, this Court said:

> We interpret *Mifflin* as giving guidance to appellate courts in determining facts based on the record before it. It eliminates a presumption which, in the Supreme Court's view, placed a disproportionate burden on an appellant to assure that the reviewing court had before it "at least so much [of the record] as is necessary to enable the court to correctly determine the case on its merits."

*Hutson v. Commonwealth*, 215 S.W.3d 708, 715 (Ky. App. 2006) (quoting *Harlan v. Commonwealth*, 68 S.W.2d 443, 445 (Ky. 1934) (emphasis deleted)). *Lamotte 1*

-15-

is undeniable proof that, in the panel's majority opinion at least, Lamotte presented a record and cited to those portions of it that were sufficient to support a conclusion of error by the trial court – that error being the denial of motions for directed verdict and judgment notwithstanding the verdict despite a failure of the prosecution to present evidence of every element of the alleged crime.

The rule in *Mifflin*, and as interpreted in *Hutson*, places upon the Commonwealth a duty, when necessary, to supplement the record before filing its brief. This is not a new concept but goes back more than a half century. In 1968, our highest court said it was up to the appellant to see that circuit court clerk "includes in the appellate record so much of the trial record . . . as is necessary to an adequate review . . . . This he may do by written request, with *the same privilege and responsibility on the part of the appellee to see that the record is complete from his or its standpoint*." *Fanelli*, 423 S.W.2d at 257-58 (emphasis added). The fact is, *Thompson* itself made the point that where the record was silent on a point detrimental to the appellee, "the completeness of [su]ch record was the responsibility of Thompson" – the appellee. *Thompson*, 697 S.W.2d at 144. The Commonwealth failed in its responsibility "to see that the record [wa]s complete from . . . its standpoint." We could have, perhaps should have, denied the Commonwealth's motion to supplement the record post-rendition.

It makes little sense, and is certainly unfair, that this Court should grant absolution to the Commonwealth for failing in its duty to see that the record is complete. Such unfairness demands a revisit, and closer scrutiny, of our decision even to entertain a post-rendition motion to supplement the record.

Such scrutiny must start with the Commonwealth's decision not to cite any trial exhibit in its brief.[8] The three pages included in Category (1) and discussed in Section I.1, *supra*, are the only documentary evidence of any kind upon which the Commonwealth's brief bases its opposition to Lamotte's insufficiency-of-the-evidence argument. And, as noted, this Court did examine those pages before rendering *Lamotte 1*. (First Vol. II, pp. 266, 268, 271; Second Volume I, pp. 112, 114, 117; Def. Exh. 5, pp. 4, 6, and 9.)

In substance then, the Commonwealth's motion to supplement is much more than what it purports to be. Nothing distinguishes this motion to supplement from a motion to amend the brief to cite additional proof it wished it had cited before the conviction was reversed. That is, the motion to supplement asks us to consider parts of the record the Commonwealth failed to cite when and where it was supposed to – in the appellee's briefs.

---

[8] The Commonwealth's direct appeal brief does state: "The medical records from Kate's [the victim's] stay at the University of Kentucky Hospital were admitted into evidence – a fact Appellant fails to acknowledge in his brief." (Appellee's Br. 12.) Citation is to the video transcript in which the attorneys discuss admitting medical records but not to any trial exhibit. The brief also cites two pages of medical records already discussed. It remains, however, that neither of the Commonwealth's briefs cites any exhibit, and this Court did not have them before it to scour.

The Commonwealth's combined petition for rehearing and motion to supplement the record is really just a request for a briefing "do-over" – a second chance at better appellate advocacy. That is more than enough reason to question whether Due Process is implicated when the Court assists the Commonwealth by allowing more process than the government is constitutionally or statutorily due. As discussed below, we can avoid addressing that question here, but it may arise again someday if a future appellate panel considers granting a post-rendition motion to supplement the record. Please learn from our experience.

In hindsight, we conclude this Court improvidently granted the motion to supplement the record post-rendition. However, now that we have, and in the interest of conducting as thorough an appellate review as these current circumstances allow, we will not rescind that portion of the interlocutory order supplementing the record with the trial exhibits we know were available to the jury and that should have been included in the certified record. In the end, doing so does not change the outcome, but reinforces the bases upon which this Court reversed Lamotte's conviction.

That record now includes all 82 exhibits the Commonwealth introduced and all 5 exhibits introduced by Lamotte. We will discuss the relevant exhibits in the Analysis, Section III, below. As the Commonwealth requested, we will especially consider its own Exhibit 81, the University of Kentucky Medical

Center (UKMC) records, which it offered in rebuttal to UKMC medical records admitted as Defendant's Exhibit 5.

But we have yet to address the third and final category of record incompleteness the Commonwealth urges us to correct – seven pages printed for the first time after we rendered *Lamotte 1*. We do so now.

3. *Evidence never seen by the jury.*

We note here that when Lamotte first moved for directed verdict, the Commonwealth had not offered in evidence even a single record from either hospital where Kate was treated. As discussed below, when the Commonwealth closed its case, the only medical proof of a serious physical injury was a paramedic's testimony and his record of Kate's transport to Frankfort Regional Medical Center (FRMC) where she arrived alert and oriented and stable in all her vital signs. The paramedic's testimony can be summed up by his declining to agree with the prosecutor that Kate's injuries were "serious physical injuries." (Video Record (VR) 1/29/19 at 2:34:23.) We discuss that testimony in detail below.

A few pages of hospital records were referenced by Lamotte's counsel when he cross-examined some of the prosecution's witnesses, but he did not introduce them then. Referring to those records, he asked Kate about her mental state on March 5, 2017, when she recanted her identification of Chase

Dugas and named Lamotte instead. With those March 5, 2017 medical records in his hand, he asked whether she had surgery that day and whether she had been anesthetized. He asked if she could refute his assertion she had been prescribed, and nurses presumably administered, certain psychotropic drugs, specifically naming "oxycodone, fentanyl"; she said she could not. (VR 1/29/19 at 2:04:35.) But Lamotte's counsel did not offer those records into evidence then.

After the trial court denied Lamotte's directed verdict motion, his attorney presented the case for the defense, but never used these records when questioning his own witnesses. At the conclusion of all testimony, there was not a single hospital record introduced. However, just before resting his case, Lamotte's counsel approached the bench to tender the 12-page grouping of May 5, 2017 medical records he referenced during the Commonwealth's case that focused on the drugs that might have affected Kate's mental state two days after her assault when she identified his client as her assailant.

The Commonwealth objected to Lamotte's "cherry-picking" of twelve pages from among 1,321 pages of medical records certified by UKMC. The trial court overruled the objection and admitted those medical records as Defendant's Exhibit 5 just before close of the defense case.

The trial court then asked if the Commonwealth had any rebuttal witnesses which it did not. However, the court allowed the Commonwealth to

introduce, as rebuttal, an additional nine printed pages of UKMC records, which were marked Commonwealth's Exhibit 81.[9]  We presume the exhibit was allowed pursuant to the rule of completeness, Kentucky Rules of Evidence (KRE) 106.  The combined twenty-one (21) pages of Defendant's Exhibit 5 and Commonwealth's Exhibit 81 are the only hospital records the jurors ever saw.  Of those twenty-one pages, only eighteen pages contain medical information.[10]  Only Lamotte's exhibits, and four pages of the Commonwealth's exhibits, are dated prior to March 9, 2017,[11] nearly a week after the incident.  Only two are from the day of the assault.

---

[9] The records appear to have been introduced pursuant to KRS 422.300(2), which states:

> Medical charts or records of any hospital licensed under either KRS 216B.105 or a similar law of another state or the United States that are susceptible to photostatic reproduction may be proved as to foundation, identity and authenticity without any preliminary testimony, by use of legible and durable copies, certified in the manner provided herein by the employee of the hospital charged with the responsibility of being custodian of the originals thereof. Said copies may be used in any trial, hearing, deposition or any other judicial or administrative action or proceeding, whether civil or criminal, in lieu of the original charts or records which, however, the hospital shall hold available during the pendency of the action or proceeding for inspection and comparison by the court, tribunal or hearing officer and by the parties and their attorneys of record.

KRS 422.300(2).  In any event, there was no objection to foundation, identity, or authenticity.

[10] Defendant's Exhibit 5 includes a page that contains only the physician's electronic signature and two pages documenting attempted pastoral visits.  (Def. Exh. 5, pp. 5, 11, 12.)

[11] Two of the Commonwealth's four pages of March 3, 2017 medical records are hand-drawn figures locating Kate's wounds. (Comm. Exh. 81, pp. 2, 3.)  The remaining two pages dated March 3, 2017, are discussed at length in the Analysis.  (Comm. Exh. 81, pp. 1, 9.)

After the trial court allowed the Commonwealth to admit its nine physical pages of hospital records, the prosecutor held up a plastic disk, commonly identified as a CD-ROM, and represented that it contained electronic copies of all 1,321 pages of the medical records certified by the UKMC custodian. Without objection, the trial court allowed the plastic disk admitted, but no more pages were printed for the jury beyond the twenty-one pages of Defendant's Exhibit 5 and Commonwealth's Exhibit 81. Counsel had nothing further.

The trial court instructed the jury at 2:01 p.m. Jurors surrendered their cellphones and electronic devices and a minute later were off to the jury room to deliberate. The jurors were given the CD-ROM, but nothing in the now-complete record suggests they had access to any device that could read its electronic content.

One hour and fifty-two minutes later, the jury returned to the courtroom and delivered a guilty verdict.

The Commonwealth asks this Court to supplement the record with seven (7) additional pages it printed from the plastic disk for the first time after we rendered *Lamotte 1*. These physical pages were not a part of the Commonwealth's Exhibit 81 or any other exhibit. We are confident no juror ever saw them.

As noted earlier, we held that granting the Commonwealth's motion to supplement the record post-rendition was improvident but left intact that portion of the order which brought before this Court the trial exhibits we know the jurors

-22-

saw. However, *Travelodge*, 710 S.W.2d at 234, prohibits this Court from supplementing the trial record with documents never filed in the record, documents the jury never saw, and that the Commonwealth printed out only after the trial, after the appeal, and after rendition of *Lamotte 1*. Those pages were not introduced in any physical form the jury could examine and, therefore, could not have influenced their decision. We cannot allow such records to now be made a part of the record on appeal.

We meticulously examined this now-complete record, including all the Commonwealth proffered as part of its post-rendition motion. In the interest of a most thorough review, the background information set forth below is taken from the entire record in both appeals. Where the Commonwealth refutes evidence, we present it in a light most favorable to the Commonwealth. Moving on to our analysis and consideration of each argument for reversal in both appeals, we will be careful to apply only evidence presented to the jury in the direct appeal and only evidence presented to the trial judge in the hearing for post-conviction relief.

No medical expert testified to explain any of the hospital records. And only one medical fact witness testified. However, the medical documents presented to the jury are replete with undefined terms and acronyms. We define them pursuant to "the authority of an appellate court to take judicial notice of an appropriate fact." *Travelers Indem. Co. v. Armstrong*, 565 S.W.3d 550, 561 (Ky.

2018) (citing KRE 201). Just what these terms and acronyms mean are "facts which can be determined from unimpeachable sources . . . such as encyclopedias . . . medical and historical treatises . . . . Beyond doubt, dictionaries fall within the same class of 'unimpeachable sources' . . . ." *Stokes v. Commonwealth*, 275 S.W.3d 185, 188 (Ky. 2008) (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 1.00[3][c], at 10 (4th ed. 2003) (quoting 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 51 (2d ed. 1994)) (internal quotation marks omitted)).

## II. BACKGROUND

Kate did not always live with her mother, Tamara Patrick (Mother). In September 2016, she moved in with her boyfriend, Chase Dugas. They resided together in Scott County until December 4, 2016, when Kate alleged Dugas assaulted her. Dugas was arrested and charged, and an Emergency Protective Order (EPO) was entered to protect Kate. She could no longer reside with Dugas.

Kate called her friend, Brandon Lamotte, to help her move back into Mother's home in Frankfort. Lamotte grew up next door and had known Kate since 2011. He agreed to help Kate move, but Kate's return home did not last.

On New Year's Eve 2016, Kate and Mother had a falling out; Mother called the police and Kate was arrested. Mother sought a Domestic Violence Order and one was entered. Consequently, Kate had to again reside elsewhere.

In mid-January, Mother learned her daughter was hospitalized in the psychiatric unit at Hardin Memorial Hospital. The hospital wanted to release Kate to Mother, but Mother was hesitant. She refused to take Kate in again unless the mental health professionals assured her Kate's psychotic issues were in check. The hospital released Kate on January 24, 2017. She stayed with relatives just a few days because she again was exhibiting delusional behavior.

On January 29, 2017, Kate was admitted to Eastern State Hospital. She resided there until February 10, 2017, when she again went to Mother's home. She was prescribed medication to treat manic episodes, a bipolar disorder, and anxiety. Kate was still residing with Mother when Dugas's criminal and domestic violence cases came up on the docket in Scott County on March 2, 2017.

Kate did not appear to testify on either Dugas's assault case or for the hearing on the protective order she sought. The court dismissed the cases and Dugas left the courthouse. He worked that night at DaVinci's Pizza and got off work around 8:30 p.m. He went home, changed clothes, and went to Applebee's restaurant until around 1:00 a.m. the next morning. He made a stop at a drug store before going home. At home, he and three friends watched a popular television show, drank alcoholic beverages, and fell asleep. None of them woke until noon.

*1. Mother discovers her injured daughter, Kate.*

According to Mother's interview with police on the day of the assault, on March 3, around 9:15 a.m., Kate went outside to smoke. She and Lamotte shared a cigarette which they had done on numerous occasions. (VR 1/29/19 at 9:23:35, Testimony of Det. Sgt. Scott Morgan.)

Mother showered. When she emerged about twenty (20) minutes later, she heard her bedroom door open. She called out, "Kate, is that you?" She heard heavy breathing and Kate, in a weak voice, say, "Mom." She entered her bedroom where Kate was lying on the floor, covered in dried blood.

Mother retrieved her phone from another room and called 911. The time was 9:40 a.m. (First Vol. III, p. 331.) Mother testified at trial that:

> While I was on the phone with 911, [Kate] got up and made her way to the bed. When she did, her shirt raised up and I could see a gash by her hip. I was still on the phone with 911, and so I said, "It looks like there's a stab wound."
>
> I described all this to the dispatch, 911, and, at some point they must have advised me . . . to place a towel or something over that wound. Why, I don't know, it was not bleeding, oddly enough.

(VR 1/29/19 at 11:19:33) (verbal disfluencies omitted[12]). Mother retrieved a towel from a linen closet. By the time she returned to Kate, "the EMT people arrived."

---

[12] Hereafter, similar verbal disfluencies are omitted from all quotations of testimony.

## 2. *Emergency medical personnel treat Kate.*

Mother let the emergency responders in and "retreated to the hall while they[13] went into the bedroom to attend to her." (*Id.* at 11:20:58.) Paramedic Chris Williams testified that he waited at the front door while his partner went down the hall to assist Kate. (*Id.* at 2:27:45.) When his partner approached Kate, she "stood up and stated, 'Help me, I've been stabbed.'" (Comm. Exh. 77, p. 3.) "The next thing I see," said Mother, "is them walking her down the hall." (VR 1/29/19 at 11:20:58.) Paramedic Williams said his partner "came around the corner, supporting the patient with his arm, and they were both walking out. . . . She was covered in dry blood, and I could see several wounds." (VR 1/29/19 at 2:28:16.) When asked whether there was a lot of bleeding, Paramedic Williams said: "The blood on the patient was dried, and she was not actively bleeding on our arrival." He simply acknowledged "she had lost blood." (*Id.* at 2:31:00.)

He then referenced the narrative he created as part of the emergency call report or "Patient Care Record." That report became Commonwealth's Exhibit 77.[14] When Kate reached the front door, she "slumped" and was

---

[13] The record shows only one EMT went to Kate while the other waited at the front door.

[14] The forms comprising Commonwealth's Exhibit 77 were prepared by the emergency medical personnel but bear a seal indicating they were obtained from the "Frankfort Regional Med[ical] Center" (FRMC). These five pages are the only documentary evidence in the certified record obtained from FRMC.

"immediately lifted and carried to the stretcher. . . then secured into the ambulance." (Comm. Exh. 77, p. 3.)

When asked to describe Kate's condition, Paramedic Williams read from his narrative, as follows:

> One of the injuries was a very large laceration on the right side of the neck from just below the angle of the jaw to the middle of the neck below the chin. There was a second laceration above it on the neck just below the chin. It was approximately one inch in diameter.[15] Both of those wounds were spread open. Patient had multiple puncture wounds to the chest. The patient had a puncture wound approximately one inch in diameter on the lower left side abdomen and a large laceration on the right-side hip approximately four inches long.

(*Id.* at 2:29:00; Comm. Exh. 77, p. 3.)

Paramedic Williams testified that, despite the fact Kate was not actively bleeding, he treated her neck wound as he would treat any neck wound:

> One of the things you always have to be concerned about with neck wounds is air getting into the blood vessels and

---

[15] Although the geometric definition of "diameter" brings to mind a circle or sphere, the medical definition is the line through the center of any foramen or opening and the distance measured along such a line. *Diameter*, STEDMAN'S MED. DICT. (28th ed. 2006) (hereinafter STEDMAN'S). The paramedic's use of the word "diameter" here reveals which of the "two primary methods" he used to measure Kate's wounds, *i.e.*: "Greatest length and width method: In this method, the greatest length and greatest width of the wound are measured across the wound's diameter, from wound edge to the opposite wound edge." Gennadi Saiko, *The Impact of the Wound Shape on Wound Healing Dynamics: Is It Time to Revisit Wound Healing Measures?* PROCEEDINGS OF THE 14TH INTERNATIONAL JOINT CONFERENCE ON BIOMEDICAL ENGINEERING SYSTEMS AND TECHNOLOGIES (BIOSTEC 2021) – VOLUME 2: BIOIMAGING 182, 182 (2021). The other method – the "clock method" – does not measure diameter. *Id.* at 183. Because Paramedic Williams stated "[b]oth of these wounds were spread open[,]" and presuming he followed medical protocol, his measurement of "one inch" was the sum of the measurements of each wound's length plus its width.

so you need to put something that won't allow air to pass into the blood vessels and cause an air embolism. So, that was the first treatment I did was placing a gloved hand over the, uh, neck lacerations.

. . . .

We also placed a moistened piece of gauze over the abdominal wound because there was [sic] possibly some intestines showing.[16] We also started an IV [intravenous drip] in route to the hospital and gave some normal saline.

(VR 1/29/19 at 2:30:18.) He also testified, as confirmed by Commonwealth's Exhibit 77, that she received no blood during transport but was placed on oxygen. (*Id.* at 2:30:55.)

The Commonwealth then asked Paramedic Williams about hypovolemic shock, a condition brought on by significant fluid loss, including but not limited to blood. When the lost fluid is blood, a potential consequence is more specifically identified as hemorrhagic shock, which is the condition referenced in Kate's hospital records. Williams was familiar with the condition and responded to the prosecutor's hypothetical, first in a general manner, then whether it applied to Kate, as follows:

Q: How would you describe the effect of hypovolemic shock with respect to a sudden, extensive loss of blood?

___

[16] The available medical records do not support a conclusion of actual evisceration, but only of tissue protrusion. Commonwealth's Exhibit 77 says: "Due to having some tissue protruding from the abdominal wounds a trauma dressing was moistened with saline and placed on the abdomen." (Comm. Exh. 77.)

-29-

A: Well, there are different phases. There is compensated shock. At that stage, your body is still being able to compensate for the blood pressure and you should see an increased heart rate and then you may, as you get further into it, see a low blood pressure. Also altered mental status can happen and confusion can.

Q: How would you describe the nature of *the injuries* this lady had received? *Were these serious?*

A: Severe.

(*Id.* at 2:34:23 (emphasis added).)

Paramedic Williams declined to agree with the prosecutor that Kate's injuries were "serious." Instead, and after a pause, he chose to call them "severe." The term "severe" and not the term "serious" is also found in Paramedic Williams's "Patient Care Form."[17] (Comm. Exh. 77, p. 5.) Our search of all the medical records failed to discover any use of the term "serious" to describe Kate's injuries. The prosecutor then shifted his line of questioning, deftly switching his inquiry away from whether this medical professional would call her injuries serious to ask whether her bleeding was severe enough to have brought on hypovolemic shock.

---

[17] Every licensed ambulance service is required by 202 Kentucky Administrative Regulations (KAR) 7:540 "to collect and submit run report data" to the Kentucky Board of Emergency Medical Services (KBEMS). Frankfort Fire & EMS complied electronically and later generated a print copy of the data as the "Patient Care Record." (Comm. Exh. 77, pp. 1-4.) Paramedic Williams completed the separate "Patient Care Form" by hand. These data are also referenced in the regulation as a "Run Report" or "continuation of care form." 202 KAR 7:540 § 7, § 7(3).

Q: Would you have considered that she was in hypovolemic shock at that time?

A: Compensated, yes, sir.

Q: As time went on, did it progress into a further state of shock?

A: When she was in the ambulance, she never went into decompensated shock. Her blood pressure remained up the entire time. However, she did have some altered mental status.

Q: Confusion?

A: I wouldn't say confusion. A decreased level of consciousness. Initially upon our arrival she was completely responsive. As we got her into the ambulance, she would respond only to verbal stimuli. And then, during transport she began to not answer as many of our questions due to the decreasing level of consciousness.

(*Id.* at 2:34:50.)

Paramedic Williams thus focused his answer on the three indicators of a deteriorating shift from compensated to decompensated hypovolemic shock, namely: (1) increasing heart rate, (2) decreasing blood pressure, and (3) decreasing level of consciousness. Commonwealth's Exhibit 77 shows the EMTs measured those specific three indicators three times before arriving at the Frankfort Regional Medical Center – at 9:50 a.m., 9:51 a.m., and 9:57 a.m. (Comm. Exh. 77, p. 1.)

Over the course of those three measurements, Kate's heart rate decreased from 120 beats per minute to 100 beats per minute and her blood pressure went from 149/129 to 201/144. (*Id.*) According to Paramedic Williams's testimony, these are *contraindicators* that do not support the Commonwealth's suggestion, relative to hypovolemic shock, that Kate's condition was worsening during transport. That suggestion is contrary to the paramedic's testimony, *supra*, that Kate never experienced the higher degree of a decompensated state of shock.

As for the third indicator, Paramedic Williams said Kate exhibited a slight decrease in consciousness. Qualitatively, she was assessed as "alert and oriented" although "lethargic." (*Id.*) But consciousness is also measured more quantitatively, most commonly by applying the Glasgow Coma Scale (GCS).[18]

The highest attainable GCS score is 15. The EMTs reported, "Upon arrival [recorded as 9:47 a.m.] PT [patient] is alert and oriented x 4. GCS 15." (*Id.*) Kate scored a GCS of 14 when assessed at 9:50 a.m. She chose to keep her eyes open (the highest eye response score, 4 out of 4); she was oriented and could correctly answer questions about who and where she was and the day and year, etc. (the highest verbal response score, 5 out of 5); and she reacted to physical stimuli (the second highest motor skill response, 5 out of 6). The only change by the time

---

[18] Developed in Scotland, the GCS is the most used scale for measuring decreases in consciousness by assessing eye response, verbal response, and motor response.

she was assessed at 9:57 a.m. is that she closed her eyes and only opened them when told to do so, the second highest GCS eye response score, 3 out of 4.  (*Id.*)

The more telling measurement, however, is the EMTs' recording of Kate's Revised Trauma Score (RTS).[19]  When Kate suffered her injuries, RTS was the most widely used predictor of trauma survival that incorporates the GCS and other vital signs.[20]  Its scale tops out at 12; the higher the score, the less likely the victim's prognosis will be death.[21]  EMTs scored Kate a 12 at each of the three times they recorded it.  (*Id.*)  This indicates the EMTs assessed the likelihood of Kate dying as effectively non-existent.

Consistent with Paramedic Williams's testimony, Commonwealth's Exhibit 77 even shows that the intravenous therapy applied to the vein at the crook

---

[19] The Revised Trauma Score, or RTS:

> has been widely used to assess prognosis in trauma patients. The RTS is a convenient tool for trauma triage and initial severity estimation that does not require sophisticated medical tests or devices and is especially useful in prehospital and emergency department (ED) settings.  This physiological scoring system consists of the Glasgow Coma Scale (GCS), systolic blood pressure (SBP) and respiratory rate (RR).  The parameters are converted to coded values (0, 1, 2, 3 or 4) assigned by specified ranges.  Each value is multiplied by a weighted coefficient before it is added.  [Tabular material omitted].

Jin Hee Jiong, et al., *The New Trauma Score (NTS):  A Modification of the Revised Trauma Score for Better Trauma Mortality Prediction*, BIOMED CENT. SURGERY (Jul. 3, 2017), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5496419/ (last accessed May 25, 2024).

[20] *Id.*

[21] *Id.*

of Kate's right elbow[22] improved her condition; Paramedic Chuck Crittenden reported on the form as follows: "Patient Response: Improved: Successful." (*Id.*)

As for her lungs, the EMTs noted Kate complained of "difficulty breathing," but they listened to all four quadrants of her lungs and recorded each quadrant as "Clear"; there was no "Wheezing," "Rales," or "Rhonchi" in any quadrant. (*Id.*, pp. 1-2.) If her difficulty breathing was psychological, it would not be revealed by the EMTs' physical assessment that her respiration was normal.

EMTs also attempted to place electrodes on Kate to perform an electrocardiogram; "however [the attempt was] unsuccessful due to the electrodes not sticking because of the amount of dried blood on [Kate's] skin." (*Id.*).

Responding to specific verbal stimuli, while "alert and oriented" and in a state of full consciousness on the GCS, Kate answered an EMT who asked her who did this "and she stated 'the devil.'" (Def. Exh. 2.) Another EMT asked "if she knew the *person* who did this to her and she said, 'yes.'" (*Id.*) (emphasis added). Kate identified "Chase" as her assailant. (*Id.*) The EMTs reported this identification to Frankfort Police Department Officer Cummins, (Second Vol. III, p. 331), and he passed on the identification to the 911 dispatcher. (First Vol. I, pp. 331-36.) The EMTs, "per the request of the Frankfort Police Department by Officer Baker[,]" repeated the information in a "Written Statement." (Def. Exh. 2.)

---

[22] Identified on the form as "Antecubital-Right."

The ambulance arrived at FRMC at 9:57 a.m. and the EMTs transferred Kate to the emergency room at 10:00 a.m. (Comm. Exh. 77, p. 4.) Paramedic Williams left a "Patient Care Form"[23] with the receiving physician, Tyler M. Corey, M.D., indicating three times that Kate's overall condition was "Unchanged" from the time the EMTs began treating her until they arrived at the hospital. (Comm. Exh. 77, pp. 4, 5; *id.*, p. 3 ("PT [patient] condition remained same"); *see also id.* p. 1 ("Patient response: Improved")). That was Kate's stable status upon arrival at FRMC.[24]

3. *Kate's treatment at FRMC.*

The Commonwealth obtained the EMT's Patient Care Record from FRMC and introduced it as Commonwealth's Exhibit 77. (*See*, footnote 14, *supra*.) Other than that EMT record, the Commonwealth introduced no medical records at all from FRMC, and there is no explanation or independent understanding why there is no proof in the unsealed record from that initial treating hospital telling us what happened there. But those records were in the sealed

---

[23] *See*, footnote 17, *supra*.

[24] At 9:57 a.m., EMTs recorded Kate's vital signs as follows: Blood Pressure, 201/144; Pulse, 100; Respiratory Rate, 28; Oxygen Saturation, 95%, GCS, 13; RTS, 12.

record, and they included a wealth of information every hospital is required to create and maintain.[25]

What the now-complete record shows happened at FRMC can still be gleaned from one page of the records the Commonwealth obtained from UKMC and introduced to the jury. That page is UKMC's own "Incoming Patient Transfer Information" form (hereafter "Patient Transfer form"). (Comm. Exh. 81, p. 9.) Other than the EMTs' Patient Care Record, that single page is the only medical record of Kate's treatment on the day she suffered her injuries – March 3, 2017 – from either FRMC or UKMC, that the Commonwealth chose to give the jury. This Court finds that oddly unexplained.

However, that single page reveals facts that cast considerable doubt about the source of Kate's serious injuries, particularly when contrasted against the EMTs' Patient Care Record, (Comm. Exh. 77), and especially in light of Mother's

---

[25] Here, we do not refer to the EMTs' report, (Comm. Exh. 77), which was not created by FRMC emergency room personnel. However, by law, every Kentucky hospital must maintain medical records "for every patient" that includes, among other things: (1) patient identification; (2) dates of care; (3) chief complaint; (4) medical history; (5) physical examination results; (6) reports of special examinations or procedures, laboratory tests, diagnostic tests, x-ray interpretations, or EKG interpretations; (7) diagnosis or reason for admission; (8) treatment notes and reports, signed and dated by a physician; (9) complete surgical record signed by the attending surgeon including anesthesia record; (10) description of operative procedures and findings; (11) diagnosis; (12) patient care plan; (13) observations and progress notes; (14) record of temperature, blood pressure, pulse, and respiration; and (15) discharge summary. 902 KAR 20:016 §3(11)(b), (f).

testimony that Kate's serious wounds happened "during the surgery[,]" (VR 1/29/19 at 11:25:20.)

UKMC's Patient Transfer form memorializes a telephone conversation initiated by a representative of FRMC[26] to arrange Kate's transfer by air ambulance to UKMC. The call was not initiated immediately when Kate arrived in stable condition, but only after FRMC personnel treated her for more than half an hour.

The UKMC representative[27] who answered that call documented in writing the information conveyed by the FRMC representative. The conversation happened at 10:35 a.m., or thirty-five (35) minutes after Kate's arrival at FRMC's emergency room at 10:00 a.m. The form provides a space where the "Reason for Transfer" to UKMC can be identified, but the space is left blank. No reason is given expressly. The reason can only be inferred.

Commonwealth's Exhibit 77 demonstrates Kate arrived at FRMC with vital signs showing she was in stable condition with no active bleeding, alert and oriented. Kate's condition only became dire during the next thirty-five

---

[26] The Sending Physician is identified on the form as "Tyler," suggestive of "Tyler M. Corey, M.D.," who is identified on Commonwealth's Exhibit 77. However, this does not necessarily mean Dr. Corey was conveying the information to UKMC. That remains unknown.

[27] The form indicates a nurse at UKMC recorded this information but his or her signature is unreadable.

minutes at FRMC as is clear from UKMC's Patient Transfer form, (Comm. Exh. 81, p. 9). That is when FRMC called UKMC for medevac help.

The first noteworthy evidence on this page is unrelated to Kate's medical care. It is her identification of her attacker. It records that "Police [were] on scene" at the hospital and that Kate named "Boyfriend (Chase)" as her assailant. (*Id.*) The rest of this document sheds considerable light on FRMC medical staff emergently engaging in her treatment.

Consistent with the EMTs' report of her unchanged stable status, Kate initially "presented A&O [alert and oriented]" at the FRMC emergency room but staff added that she had an "AMS [altered mental status] on presentation." (*Id.*) Her vital signs at FRMC were within the following ranges: Pulse – 118 to 130; Blood Pressure – 121/76 to 130/82;[28] Oxygen Saturation – 95% to 98%. (*Id.*) Excepting the blood pressure anomaly referenced in footnote 28, *supra*, these are comparable to the EMTs' recordation on the Patient Care Record of the same vital signs from 9:47 a.m. to 10:00 a.m. (Comm. Exh. 77.) But something happened

---

[28] The UKMC patient transfer form includes the following notation indicating Kate's blood pressure was "81/40 initially." (Comm. Exh. 81, p. 7.) The word "initially" suggests it is the first reading of her blood pressure in the emergency room at approximately 10:00 a.m. This directly contradicts the EMTs' recordation of blood pressure at 9:57 a.m. as 201/144, (Comm. Exh. 77, p. 1), and is inconsistent with every other measurement of her blood pressure, including the measurement taken by in-flight medical personnel (111/65) and the first measurements at UKMC from 11:05-11:12 a.m. of 100/72-113/66. (Comm. Exh. 81 (CD-ROM) 1312, 1314, 1319 of 1324.) The "Patient Care Form" (Comm. Exh. 77, p. 5) reported to KBEMS indicates her blood pressure at the time of transfer from the ambulance to FRMC at 10:00 a.m. was 165/109.

that is inconsistent with the EMTs' report of her RTS indicating Kate's prognosis was good.

Notwithstanding the EMTs' report of finding Kate's "ABCs [airway, breathing, circulation] intact with a patent open airway" and that her "lungs are clear to auscultation" with no wheezing, rales, or rhonchi, (Comm. Exh. 77, pp. 2, 3), emergency room personnel, initiated "RSI [rapid sequence intubation,]" (Comm. Exh. 81, p. 1), by administering "ROC [rocuronium,]"[29] "ETOM [Etomidate,]"[30] and "SUCCS [succinylcholine chloride,]"[31] (*Id.*, p. 9), before placing an "OETT [oral endotracheal tube]" down Kate's throat. (*Id.*) That is, emergency medical staff administered anesthetics and a muscle relaxer and fed a tube into her airway, passing rapidly through her pharynx, larynx, and trachea.

---

[29] "Rocuronium [(ROC)] is a non-depolarizing neuromuscular blocking agent (NDNMBA), employed in the clinic as an adjunct to general anesthesia to facilitate tracheal intubation rapid sequence, and to provide skeletal muscle relaxation during surgery." Annalisa Capuano, *et al.*, *Complete Resistance After Maximal Dose of Rocuronium*, J. PHARMACOL. PHARMACOTHER., July-Sept. 2015, at 175, 175.

[30] "Etomidate is a useful agent for carefully conducted procedural sedation because it provides effective, brief, deep sedation with little hemodynamic compromise." David R Vinson and David R Bradbury, *Etomidate For Procedural Sedation in Emergency Medicine*, ANNALS OF EMERG. MED., June 2002, at 592, 598.

[31] "'Succs' referenced succinylcholine [chloride], a paralytic drug that is commonly used in emergency rooms." *Higgs v. State*, 222 P.3d 648, 650 (Nev. 2010). "For rapid sequence intubation, there is no substitute for succs." Maryn McKenna, *Hospital Pharmacists Scrambling Amid Vast Drug Shortages*, 57 ANNALS OF EMERG. MED., Feb. 2011, at 13A, 13A.

As for her lungs, the EMTs' Patient Care Record indicated Kate was showing no symptoms of pneumothorax.[32] Nor is there any evidence in the *unsealed* record that FRMC staff x-rayed Kate's lungs or used a stethoscope to determine whether, contrary to the EMTs' report, she was experiencing a pneumothorax upon arrival at FRMC.[33] That is, there is nothing in the *unsealed*

---

[32] The U.S. National Library of Medicine, National Institutes of Health (NLM-NIH) describes pneumothorax, commonly called a "collapsed lung," and lists its symptoms as follows:

Common symptoms of a collapsed lung include:

- Sharp chest or shoulder pain, made worse by a deep breath or a cough.
- Shortness of breath.
- Nasal flaring (from shortness of breath).

A larger pneumothorax causes more severe symptoms, including:

- Bluish color of the skin due to lack of oxygen
- Chest tightness
- Lightheadedness and near fainting
- Easy fatigue
- Abnormal breathing patterns or increased effort of breathing
- Rapid heart rate
- Shock and collapse

*Collapsed Lung*, NLM.NIH.GOV, https://www.nlm.nih.gov/medlineplus/ency/article/000087.htm (last visited Jul. 5, 2024).

[33] The National Institutes of Health also tells us how a pneumothorax can be detected, as follows:

The health care provider can detect some symptoms of pneumothorax with a stethoscope that reveals decreased breath sounds or no breath sounds on the affected side or by detecting low blood pressure. Other ways of determining whether a patient has pneumothorax include:

- Chest x-ray
- Arterial blood gases and other blood tests
- CT scan if other injuries or conditions are suspected
- Electrocardiogram (ECG)

record supporting a diagnosis of pneumothorax.  But there is a good reason for that.  The *sealed* record has certain proof to the contrary.

The sealed record includes an exculpatory document demonstrating Kate was not suffering from a collapsed lung when she arrived at FRMC.  The 344th unnumbered page of the second package of sealed records is an FRMC medical record entitled "Diagnostic Imaging Report."  (Sealed Record, Package 2, [344].)  It shows the FRMC emergency room physician inserted the OETT, or oral endotracheal tube referenced in Commonwealth's Exhibit 81, page 9, immediately upon Kate's arrival and, one minute later, "at 1001 hours" ordered a "Radiology chest 1 view" or x-ray of Kate's chest.  (Sealed Record, Package 2, [344].)  A "Frontal chest [x-ray] was obtained" by radiologist Sean Owens, M.D., which confirmed "Endotracheal tube projects within good position."  (*Id.*)  More importantly to this case, however, is what it says about Kate's lungs.

The Diagnostic Imaging Report says:  "There is *no* consolidation or *atelectasis in either lung*."  (*Id.*)  "Atelectasis" is defined as "Airlessness of the lungs, due to failure of expansion or resorbtion of air from the alveoli.  *See also* pulmonary collapse." *Atelectasis*, STEDMAN'S MED. DICT. (28th ed. 2006) (hereafter STEDMAN).  That is, her lungs were working fine.  Furthermore, "There

---

*Collapsed Lung*, NLM.NIH.GOV, https://www.nlm.nih.gov/medlineplus/ency/article/000087.htm (last visited Jul. 5, 2024).

are no pleural effusions." "Pleural" refers to the serous membrane enveloping the lungs and lining the walls of the pleural cavity. *Pleura* and *pleural*, STEDMAN. "Effusion" is "[t]he escape of fluid . . . into the tissues or a cavity." *Effusion*, STEDMAN. None of that was present.

If that is not clear enough, it also says: "There is no pneumothorax . . . . Lungs are clear." *Pneumothorax*, STEDMAN ("presence of air or gas in the pleural cavity"). That is, Kate was not experiencing a collapsed lung at 10:01 a.m.

Dr. Owens dictated this report at 10:32 a.m. on 3/3/2017; that is three minutes before FRMC called UKMC for help. We do not know when this information might have been conveyed verbally to the ER physician engaging in heroic treatment in the ER,[34] but apparently not before Kate was treated for a condition she did not have. Although there are less dramatic and less invasive options for treating patients who, unlike Kate, are suffering pneumothorax,[35]

---

[34] Heroic treatment is defined as "an aggressive, daring procedure in a dangerously ill patient that, in itself may endanger the patient but also has a possibility of being successful, whereas lesser action would inevitably result in failure." *Heroic*, STEDMAN'S.

[35] The National Institutes of Health describe treatment for pneumothorax as follows:

> A small pneumothorax may go away on its own over time. You may only need oxygen treatment and rest.

> The provider may use a needle to allow the air to escape from around the lung so it can expand more fully. You may be allowed to go home if you live near the hospital.

> If you have a large pneumothorax, a chest tube will be placed between the ribs into the space around the lungs to help drain the air and allow the lung to re-expand.

FRMC staff emergently inserted "Bil[ateral] chest tube[s]" into Kate's pleura. (Comm. Exh. 77.) The now-complete record shows no evidence of any problems with Kate's lungs when she arrived at FRMC, but she was treated there as if both lungs had collapsed.

Similarly, when EMTs arrived at Kate's home, and when Kate subsequently arrived at the FRMC emergency room, "her wounds [we]re not actively bleeding." (Comm. Exh. 77, p. 3.) As Paramedic Williams testified, Kate never experienced decompensated hypovolemic shock in the ambulance and Paramedic Chuck Crittenden's report shows her condition was improving. (Comm. Exh. 77, p. 1.) Although Williams acknowledged Kate lost some blood, he did not characterize her blood loss as life-threatening and what blood she had lost had congealed by the time he arrived. Nevertheless, FRMC medical personnel treated Kate for severe blood loss by administering Tranexamic Acid ("TXA"[36]) to control exsanguination. (Comm. Exh. 81, p. 7.) To replace the blood ER personnel assumed Kate lost, they gave her two infusions of packed red blood cells. (*Id.* ("PRBC x 2").) This is confirmed by the UKMC attending note entered

---

*Collapsed Lung*, NLM.NIH.GOV, https://www.nlm.nih.gov/medlineplus/ency/article/000087.htm (last visited Jul. 5, 2024).

[36] "Tranexamic acid (TXA) is an antifibrinolytic agent used to prevent traumatic exsanguination." Rachel Stansfield, Danielle Morris, Emmanuel Jesulola, *The Use of Tranexamic Acid (TXA) for the Management of Hemorrhage in Trauma Patients in the Prehospital Environment*, SHOCK, Mar. 2020, at 277, 277.

the same day at 11:15 a.m. that "MTP [massive transfusion protocol was] initiated prior to patient arrival" at UKMC.  (Comm. Exh. 81 (CD-ROM) 22 of 1324.[37])

We also know FRMC medical personnel performed a pharyngotomy. (Def. Exh. 5, pp. 4, 9.)  A pharyngotomy is a "cutting operation on the pharynx[38] either from without or from within." *Pharyngotomy*, STEDMAN.  To state the obvious, an "operation" is a "surgical procedure" as distinguished from a non-surgical stabbing. *Operation*, STEDMAN'S ("1. Any surgical procedure."). According to the medical records, the pharyngotomy occurred during "neck exploration," apparently when FRMC medical personnel were engaged in exploratory surgery looking for internal bleeding.  (Def. Exh. 5, pp. 4, 9.)  Our search of the record did not reveal evidence of internal bleeding.

Kate also experienced a "hypoglossal[39] nerve transection[40]" while at FRMC.  (Def. Exh. 5, pp. 4, 9.)  Mother explained that to the jury in lay terms when she testified that "during the surgery, they cut the nerve to half of [Kate's]

---

[37] Although the jury could not have seen this page, the Court can access the information on the CD-ROM.  We reference it here as confirmation of what the jury did see (as we will discuss in the Analysis) and to provide as complete a background now possible by a record the Commonwealth insisted we see post-rendition.

[38] *Pharynx*, STEDMAN'S ("the throat, the joint opening of the gullet and windpipe").

[39] *Hypoglossal*, STEDMAN'S ("Below the tongue.").

[40] *Transection*, STEDMAN'S ("2. Cutting across.").

tongue." (VR 1/29/19 at 11:25:20.) Mother was not referring to Lamotte as "they," but to the medical staff at FRMC.

Without combing further through the sealed FRMC records, we do not know whether FRMC personnel performed the pharyngotomy and tongue nerve transection before or after they performed the rapid sequence intubation, the massive transfusion protocol, and the bilateral tube thoracostomies. We do know, however, that these procedures had to be "repaired" by UKMC medical staff. (Def. Exh. 5, pp. 4, 9 ("pharyngotomy, hypoglossal nerve transection s[tatus]/p[ost] neck exploration, complex repair")); (Comm. Exh. 81 (CD-ROM) 8 of 1324[41] ("Pharyngotomy repair . . . revealed a 5 cm pharyngotomy . . . and the defect repaired in multiple layers[.]")).

We also know Kate developed several new symptoms as FRMC personnel treated her. These were readily observable symptoms obviously not observed by any EMT or paramedic; otherwise, the symptoms would have been recorded before Kate arrived at FRMC. For example, between her home and FRMC, Kate was conversant and answered questions about who and where she was and the day and year, and even identified her assailant as Chase Dugas. That conversation is how the EMTs determined she was alert and oriented. (Comm.

---

[41] *See*, *supra*, footnote 37.

Exh. 77, p. 1.)  When Kate arrived at UKMC, she had an "inability to communicate."  (Comm. Exh. 81, p. 4.)  Kate's loss of speech occurred at FRMC.

While at FRMC, Kate developed Horner Syndrome, sometimes called "Horner's" syndrome.  "Horner syndrome is a rare condition classically presenting with partial ptosis (drooping or falling of the upper eyelid), miosis (constricted pupil), and facial anhidrosis (absence of sweating) due to a disruption in the sympathetic nerve supply" including the pharyngeal nerve plexus located upon the outer surface of the pharynx.  Zalan Khan, Pradeep C. Bollu, *Horner Syndrome*, NLM.NIH.GOV, https://www.ncbi.nlm.nih.gov/books/NBK500000/ (last visited Jul. 9, 2024).  *See Syndrome*, *Horner's*, STEDMAN'S.  The only reasonable inference to be drawn from the evidence is that Kate experienced Horner's syndrome when, and because, FRMC personnel performed the pharyngotomy and hypoglossal nerve transection in the FRMC emergency room.

Although this aggressive, heroic treatment of Kate by FRMC is clear from the Commonwealth's Exhibit 81, no expert or other medically trained person explained it to the jury.  But Kate's mother's lay explanation should have sufficed when she said that, "during the surgery, they cut the nerve to half of her tongue." (VR 1/29/19 at 11:25:20.)

*4. UKMC medical personnel treat Kate's injuries.*

As noted, the jury was given none of the sealed FRMC records that hospital was required to create. Just as perplexing, the jury only even saw two pages of UKMC records dated March 3, 2017, the date Kate suffered her injuries. The first, discussed above, is the Patient Transfer form. (Comm. Exh. 81, p. 9.) The second is the first page only of the three-page University of Kentucky Hospital Emergency Department Trauma/Critical Care Nursing Report (hereafter "Nursing Report"). (Comm. Exh. 81, p. 1. [42]) This document reveals more symptoms Kate developed while FRMC personnel treated her.

Like all the Commonwealth's medical record exhibits other than the EMT Report, the Nursing Report was not introduced through a witness but just handed to the jury as an authenticated business record. It shows Kate's "Arrival Time" of 11:04 a.m., (*id.*), but that was her arrival at the "Trauma Bay." (Comm. Exh. 81 (CD-ROM) 1314 of 1324.[43]) The air ambulance reached the UKMC helipad eight minutes earlier, at 10:56 a.m., and her blood pressure was recorded as 134/59. (Comm. Exh. 81 (CD-ROM) 370, 375 of 1324.[44])

---

[42] However, as noted in footnote 11, *supra*, there were two pages of hand-drawn figures showing the location of Kate's wounds.

[43] *See*, footnote 37, *supra*.

[44] *See*, footnote 37, *supra*.

She spent twelve (12) minutes in the Trauma Bay where her blood pressure was taken three more times, never dropping lower than 100/72. (Comm. Exh. 81 (CD-ROM) 1312 of 1324.[45]) These blood pressure readings at UKMC, those taken by the EMTs, and those identified on the Patient Transfer form as taken at FRMC, reveal a single incongruity – FRMC personnel's report to UKMC that Kate's blood pressure upon arrival at FRMC's emergency room at 10:00 a.m. was 81/40. (Comm. Exh. 81, pp. 1 and 9.) The person who recorded this reading did not take the reading herself, but merely recorded what the person who called UKMC told her when he was trying to obtain medevac transport and UKMC's agreement to admit Kate. But that report of Kate's initial blood pressure directly contradicts the EMTs' report of her blood pressure at that same moment, 10:00 a.m., as 165/109. It defies logic that both could be correct. Notably, the EMTs' reading of 165/109 is consistent with the many readings appearing in the entire record, taken by various persons, that never went lower than 100/66. FRMC's report of Kate's blood pressure as 81/40 stands out as an abject anomaly.

The Nursing Report and the EMTs' Patient Transfer form bookend the events that occurred at FRMC. Comparing them reveals two notable deviations from Kate's stable condition when EMTs presented her to the FRMC ER at 10:00

---

[45] *See*, footnote 37, *supra*.

a.m., to her unstable condition when she arrived at UKMC at 10:56 a.m. These were dramatic drops in her trauma survival predictor and her GCS.

Although the EMTs recorded their observation of Kate's eyes while utilizing the GCS consciousness scale and rated her the highest possible score on the RTS trauma survival predictor, they made no mention of contracted pupils, and they found no "Neurologic Deficit" as might have been reflected by miosis or "Facial droop." (Comm. Exh. 77, pp. 1, 3.) These indicators were nonexistent when Kate arrived at FRMC. But that changed at FRMC.

Less than an hour later, when Kate arrived at UKMC, her pupils had contracted to one (1) millimeter, (Comm. Exh. 81, p. 1), and, based partly on that symptom and her partial ptosis, UKMC medical personnel diagnosed her with "Horner's syndrome . . . likely related to [Kate's] initial injuries *and operations*." (Comm. Exh. 81, p. 6 (emphasis added).) But UKMC personnel made that diagnosis without knowing the EMTs' Patient Care form made no mention of the obvious and unmistakable symptoms of Horner's syndrome. Logically, that leaves as the cause of Horner's syndrome only the "operations" at FRMC, including the pharyngotomy and hypoglossal nerve transection that Mother called "the[ir] cut[ting of] the nerve to half of her tongue." (VR 1/29/19 at 11:25:20.)

Additionally, while Kate's GCS score was thirteen (13) when she arrived at FRMC, (Comm. Exh. 77, p. 1), whatever happened there caused it to

drop to the lowest attainable score of three (3) by the time she arrived at UKMC. (Comm. Exh. 81, p. 1.) Likewise, her RTS score when she arrived at FRMC was 12 out of 12 – the highest possible score – , but it dropped to 7 out of 16 when UKMC assessed it by a modified version of the RTS.[46] (Comm. Exh. 81, p. 1.)

Other medical records the Commonwealth presented to the jury were not as enlightening. However, none support a finding that Lamotte caused Kate "serious physical injury." In addition to the scant two pages of medical documents from the date of the incident, the Commonwealth introduced five other printed pages dated March 9, 10, and 15, 2017, that tell us a bit of what occurred on those dates and summarize some of the history of Kate's UKMC stay. Again, there was no testimony from any medical professional either from the FRMC emergency room or the UKMC trauma bay, or any other physician or nurse. The jurors were simply handed these pages.

The March 9 record reveals there were "wounds/trauma, inability to communicate[.]" (Comm. Exh. 81, p. 4.) We should note that, in the vernacular of medical professionals, a wound is not only defined as "[a]n injury or traumatism" to the human body, but also as "[a] surgical incision" such as would be made by an

___

[46] UKMC used a modified version of the RTS, simply called "Trauma Score," that included a qualitative "Respiratory Effort" and "Capillary Refill" in addition to respiration rate, systolic blood pressure and GCS. This made the scale from worst to best, 1 to 16, compared with the RTS whose range from worst to best is 1 to 12. (Comm. Exh. 81, p. 1.)

emergency room physician performing a pharyngotomy or accidentally cutting a nerve to the tongue. *Wound*, STEDMAN'S.

That record also says Kate was taking medication for anxiety, and that "Psychiatry will continue to follow." (*Id.*)

The March 10 record shows Kate was ready to move to "PCU," the Progressive Care Unit. (Comm. Exh. 81, p. 5.) Her vital signs over the "last 24h" were consistent with what the EMTs recorded, including: a pulse of 112 (with a low-to-high range of 105 to 121); blood pressure of 109/67 (ranging 100/66 to 132/94); respiratory rate of 24 (ranging 18 to 32); and blood oxygen saturation of 96% (ranging 93% to 99%). (*Id.*) There was a "[p]lan for swallow study" on that date to assess Kate's prognosis following UKMC's repair of the pharyngotomy performed at FRMC, as well as reference to UKMC's repair of the FRMC's hypoglossal nerve transection. (*Id.*)

The three (3) pages dated March 15, 2017 – Kate's discharge date – said her admitting diagnosis was "Traumatic hemorrhagic shock" to be treated for "Stab wounds[.]" (Comm. Exh. 81, p. 6.) "[S]he was taken emergently to the operating room on arrival" where she "underwent an Exploratory celiotomy" for internal bleeding from the wound to her abdomen but there is no mention of internal bleeding found on these records. (*Id.*) The record also states, "ENT

-51-

consulted intraoperatively"; that is, a medical specialist in injuries to the throat was called to the operating room and conducted:

> [a]nterior neck exploration w/ control[led] bleeding, EGD with PEG placement,[47] ligation of penetrating injury to external jugular vein (right), repair of multiple complex lacerations >50cm length.  Chest tube was placed on 3/5 for persistent pneumothorax . . . weaned from ventilator . . . Horner's syndrome, likely related to initial injuries and operations. . . .

(*Id.*)

Kate's disposition upon discharge was to Cardinal Hill Rehabilitation Hospital; her condition was "stable (signs or symptoms of potential problems absent or manageable)." (*Id.*, p. 7.)   She was released with "No restrictions," but follow-up was recommended with UK Otolaryngology [ENT] and with her previous psychiatric providers, Drs. Huff and Ghanta.  (*Id.*, p. 8.)

In summary, we reluctantly granted the Commonwealth's motion to supplement the record on appeal, post-rendition with these documents.  Those documents reveal less about how serious Kate's injuries were when she left her home in an ambulance and more about how serious her wounds were to her tongue and lungs after treatment at FRMC.  These trial exhibits, however, do give context to the testimony of the few witnesses who told the jury about Kate's injuries.

---

[47] Insertion of a feeding tube directly to the stomach.

5. *Testimony about Kate's injuries.*

An unknown number of FRMC physicians and nurses could have testified about Kate's treatment in their emergency room, but the prosecution called none of them. Only a few witnesses testified about Kate's injuries at all. We now set out the testimony as it relates to the seriousness of Kate's injuries.

We previously addressed some of Paramedic Williams's testimony above. However, we especially return to the point when he was asked directly if Kate's injuries were serious. He declined to say yes. Instead, he said her injuries were "Severe." (VR 1/29/19 at 2:35:04.) Rejection of the term "serious" here is meaningful to medical professionals. To them, "the term 'severe' . . . is not the same as 'serious,' which is based on patient/event outcome or action criteria usually associated with events that pose a threat to a patient's life or functioning." *Severe*, CDISC TERMINOLOGY (2021).[48] This approach is quite similar to that

---

[48] The Clinical Data Interchange Standards Consortium (CDISC) is a standards developing organization dealing with medical research data and healthcare. The standards support medical research from protocol through analysis. CDISC standards compliance is mandatory for all submissions to the Uunited States Food and Drug Administration. CDISC distinguishes the definitions of "severe" and "serious" from one another.

> (severe) An adjective for grading intensity on a relative scale describing a symptom, outcome or event. Note: The term 'severe' is often used to describe the intensity (severity) of a specific event (as in mild, moderate, or severe myocardial infarction); the event itself, however, may be of relatively minor medical significance (such as severe headache). *This is not the same as 'serious,' which is* based on patient/event outcome or action criteria *usually associated with events that pose a threat to a patient's life or functioning.*

which our jurisprudence takes. *See Brown v. Commonwealth*, 553 S.W.3d 826, 832 (Ky. 2018) ("finding of *serious physical injury* is dependent on the seriousness of the resulting injury, not the potential of the act to result in 'serious physical injury.'" (internal quotation marks and citation omitted)). The focus of both is the threat to a person's life or functioning. Thus, there is a correlation between the medical understanding of, for example, "serious wounds" resulting from medical treatment, and the legal understanding of the term "serious physical injury" resulting from an assault. By rejecting the characterization of Kate's wounds as serious, and instead choosing the adjective "severe," Paramedic Williams was effectively answering that, in medical terms, Kate's wounds did not "pose a threat to [her] life or functioning." *Severe*, CDISC TERMINOLOGY (2021). *See* footnote 48, *supra*. That understanding of his testimony is consistent with the Patient Care Record he and his fellow paramedics and EMTs prepared. (Comm. Exh. 77.)

Detective Charles Washburn testified that when he interviewed Kate in the hospital two days after the incident, "she couldn't talk." (VR 1/28/19 at 3:43:30.) But the evidence shows Kate could talk before she arrived at FRMC.

---

*Severe*, CDISC TERMINOLOGY (2021), *available at* https://www.cdisc.org/standards/glossary.pdf (last viewed Jul. 25, 2024) (emphasis added). *See also Wilson v. Astrue*, No. CIV. A. 07-312-JMH, 2008 WL 631241, at *3 (E.D. Ky. Mar. 5, 2008) ("'serious,' as used by a doctor, is not the same as 'severe'"). "[H]ealth care terminology of all data domains were [sic] normalized to CDISC standard terminology." ¶ 311,397 Data Standards For Drug and Biological Product Submissions Containing Real-world Data Guidance For Industry, Food Drug Cosm. L. Rep. P 311397 (emphasis omitted).

The only reasonable inference to be drawn is that Kate's inability to talk was caused by FRMC's treatment, which is exactly what Mother testified – the doctors cut her hypoglossal nerve.

Kate's half-sister, Chelsea Ford, said:

Well, I hadn't seen her alert and awake in, in weeks,[49] honestly, when I went to visit her, um. She had been severely injured; she's really lucky to be alive today, honestly, and I think that UK did a really great job of taking care of her. Had it not been for them I don't think she would be here today.

(1/29/19 at 9:07:43.) Chelsea's testimony that Kate "had been severely injured" is admissible lay opinion. *McKinney v. Commonwealth*, 60 S.W.3d 499, 504 (Ky. 2001). However, it has no probative value regarding the ultimate fact, and element of the crime, whether her sister suffered a serious physical injury as defined by statute and, further, it sheds no light on the source of Kate's injuries.

Mother testified she found Kate "on the floor, uh, with lots of blood – lots of blood" and when Kate "made her way to the bed . . . I could see, um, a, a gash by her hip." (VR 1/29/19 at 11:17:49.) She said 911 emergency services "must have advised me to place a towel or something over that wound. Why, I

---

[49] Kate had only been in the hospital at UKMC for two days. However, Kate did have a history of psychiatric hospitalization leading up to March 3, 2017.

don't know, it was not bleeding, um – oddly enough." (*Id.*) Consistent with the EMTs' Patient Care Record, there was no active bleeding that needed tending.[50]

Lay testimony such as Mother's testimony of large amounts of blood has supported, with other evidence, a finding of serious physical injury. For example, in *Brooks v. Commonwealth*, "[t]he most immediate risk [of death] was occasioned by the victim's loss of blood." 114 S.W.3d 818, 824 (Ky. 2003). But the evidence is unrefuted that Kate was not actively bleeding when Mother found her, and the amount of blood she lost before that was not great.

The Commonwealth offered into evidence a photo showing smears of dried blood on Kate's pillow which, all told, covered an area about the size of the sheet of paper seen in the photo near the pillow. (Comm. Exh. 45.) Bleeding out was no risk at all by the time Mother found Kate. And the jury was presented with no evidence Kate ever suffered internal bleeding. She remained ambulatory, made her way to the bed, and even walked to the ambulance with little assistance. Neither Mother's testimony nor the EMTs' Patient Care Report nor the photo of the blood loss support an inference Kate was at risk of losing her life by blood loss.

Kate herself testified about her injuries, incidentally putting them in two categories – (1) those she points to when asked where Lamotte stabbed her for

---

[50] Commonwealth's Exhibit 45 is a photo showing smears of dried blood on Kate's pillow which is smaller in size than the sheet of paper observable near the pillow in the photo.

which there is no evidence of their seriousness, and (2) those the prosecutor specifically asks her about *because* of their severity and which the trial exhibits indicate were caused by medical personnel after Kate's arrival at FRMC.

Of course, she testified Lamotte stabbed her. When the prosecutor asked where, she pointed to three places – her right chest above the breast, her left chest above the breast, and her lower right side "indicating [her] hip." She also said he stabbed her in the back. (VR 1/29/19 at 1:26:20.) She did not point to her neck. The prosecutor had to direct her there.

> Q: We've seen a video of your, you being in the hospital, and you've got a lot of stuff around your neck, explain all that to me?
>
> A: Um, I, they had to do a tracheotomy right here [points to the base of her neck] where to help me breath and talk, um.
>
> Q: Yeah, and have you had any lingering issues, any continuing health issues as a result of this attack?
>
> A: It's hard, it's actually still to this day hard for me, um, to eat, uh, food and drink.
>
> Q: What about your speech [indiscernible]?
>
> A: Um, my speech has improved quite a bit from back when the interviews were taken, but I had to have, um, a surgery on my vocal cords, another additional surgery.

(VR 1/29/19 at 1:34:06.)

Summarizing Kate's testimony, when asked to point out where Lamotte attacked her, she did not point to her neck, the site of FRMC's pharyngotomy and hypoglossal transection. The "lingering issues" as the Commonwealth calls them – Kate's difficulty swallowing and speaking – were the result of those surgical procedures.

There was no other testimony about Kate's injuries. The balance of the Commonwealth's argument that Kate suffered a serious physical injury at the hands of Lamotte is based on the handful of medical records the jury was presented and that we have thoroughly described as not reasonably supporting a factual finding that Lamotte inflicted a serious physical injury upon Kate.

## III.   ANALYSIS

As in our original rendition of this appeal, our focus is on Lamotte's argument that the Commonwealth failed to prove each element of first-degree assault under KRS 508.010(1). We are persuaded that the Commonwealth failed to introduce evidence sufficient to create a reasonable inference that Lamotte's actions inflicted upon Kate a serious physical injury as defined by KRS 500.080(15).

### 1. *Standard of Review.*

"When this Court reviews a trial court's decision to deny a motion for judgment notwithstanding the verdict, we apply the same standard of review that

-58-

we use when reviewing a lower court's decision to deny a motion for a directed verdict." *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 261 (Ky. App. 2007) (citing *Prichard v. Bank Josephine,* 723 S.W.2d 883, 885 (Ky. App. 1987)).

When considering a criminal defendant's motion for a directed verdict:

> the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

> The standard for appellate review is equally clear: "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."

*Eversole v. Commonwealth*, 600 S.W.3d 209, 218 (Ky. 2020) (quoting *Benham*, 816 S.W.2d at 187).

2. *Serious Physical Injury defined by statute.*

Pursuant to KRS 508.010(1)(a), for a jury to find a defendant guilty of first-degree assault, the Commonwealth must prove beyond a reasonable doubt:

> (a) [the defendant] intentionally *cause*[*d*] *serious physical injury* to another person by means of a deadly weapon or a dangerous instrument . . . .

KRS 508.010(1)(a) (emphasis added). The Commonwealth must prove beyond a reasonable doubt that the victim suffered a serious physical injury but, as importantly, that the serious physical injury suffered was caused by the defendant.

Under KRS 500.080(15), "serious physical injury" is of several types: "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." KRS 500.080(15). The Commonwealth argues there is proof Lamotte's actions: (1) created a substantial risk of Kate's death, (2) caused Kate prolonged impairment of her health, and (3) caused Kate prolonged impairment "of her tongue which is a bodily organ." (Appellee's Br. 11-14.) We disagree.

### 3. *Serious Physical Injury Jurisprudence.*

This court previously interpreted KRS 500.080(15) as "set[ting] a fairly strict level of proof which must be met by sufficient evidence of injury, medical and/or non-medical, taken as a whole, before an instruction on first-degree assault may be given." *Prince v. Commonwealth*, 576 S.W.2d 244, 246 (Ky. App. 1978). Despite this strict standard, KRS 500.080 does not require medical expert testimony to prove a serious physical injury to satisfy the evidentiary requirements of KRS 508.010(1). *Brooks*, 114 S.W.3d 818; *see also Prince*, 576 S.W.2d at 246. Kentucky has never taken a position whether lay testimony will adequately

-60-

substitute for expert testimony in determining medical causation. The following is as close as our jurisprudence comes.

"When determining whether a defendant *caused* a 'serious physical injury,' the issue is not whether there was proof of an act that *could **cause*** 'serious physical injury.' The issue is whether there was proof of an act that *did*, in fact, ***cause*** 'serious physical injury.'" *Anderson*, 352 S.W.3d at 581 (emphasis original; double emphasis added) (citing *Commonwealth v. Hocker*, 865 S.W.2d 323 (Ky. 1993) (Leibson, J., dissenting)). Causation can be the crucial part of the proof as this case demonstrates. *See Commodore v. Commonwealth*, No. 2018-SC-000617-MR, 2020 WL 2831437, at *15 (Ky. May 28, 2020)[51] ("much of our jurisprudence

---

[51] Unpublished opinions should not be disregarded out of hand. As Justice Conley wrote in *Taylor v. Commonwealth*:

> Although unpublished cases as a rule are not meant to be cited as official pronouncements of what the law is, it would be disingenuous to say that this Court is not bound by oath and fidelity to consistently apply the law in both published and unpublished decisions.

*Taylor v. Commonwealth*, 671 S.W.3d 36, 42 (Ky. 2023). This Court of Appeals follows that guidance. And, in the absence of any published opinion on point:

> we are free to allow these [unpublished] cases as much or as little *persuasive* value as we choose. Still, we cite them, and distinguish them as necessary, to assure the bar of a jurisprudential consistency that transcends the published/unpublished distinction. "While unpublished opinions may, by rule or tradition, lack the precedential authority accorded published decisions, unless the issuing courts have simply ruled incorrectly, these opinions should be considered correct in their expressions of law or application of law to facts." J. Thomas Sullivan, *Unpublished Opinions and No Citation Rules in the Trial Courts*, 47 Ariz. L. Rev. 419, 445 (2005).

*Turner v. Commonwealth*, 538 S.W.3d 305, 313 n.15 (Ky. App. 2017) (emphasis added).

on first-degree assault and the "serious physical injury" requirement focuses on the end result – the injury itself – and the ***causation*** of that injury" (emphasis added)).

Courts are thus required to engage in a case-by-case analysis to determine from "the totality of the evidence" if a defendant's actions *caused* a serious physical injury. *Cooper v. Commonwealth*, 569 S.W.2d 668, 671 (Ky. 1978). Like serious physical injury, causation by the defendant as opposed to some other actor is also an element that due process requires be proved beyond a reasonable doubt. The jury believed Lamotte attacked Kate. That necessarily means they believe he caused the injuries the EMTs treated.

### 4. *Applying the law to the evidence of record.*

In the context of this jurisprudence, the proof is lacking that the injuries Kate identified as having been caused by Lamotte resulted in serious physical injury. We will examine the issue from the Commonwealth's perspective and in a light most favorable to the Commonwealth.

#### a. It would be clearly unreasonable for a jury to find Lamotte caused Kate to suffer a substantial risk of death.

Citing *Brown*, *supra*, the Commonwealth argues "evidence of pneumothorax [collapsed lung], standing alone, [i]s sufficient to support a finding of serious physical injury as it created a substantial risk of death." (Appellee's Br. 12 (citing 553 S.W.3d at 831).) Our reading of *Brown* does not support such a bright-line rule because it ignores causation. In *Brown*, the defendant's stabbing of

his victim three times in her chest did not merely puncture the skin. The medical proof was that it actually punctured her lung, thereby causing the *acute pneumothorax* she experienced – a collapsed lung attributable to a traumatic event. *Id*. *Brown* does not ignore the causation element, stating it would not be unreasonable to find a serious physical injury where, "[a]s a *result of the stabbing*," the victim "suffered a punctured lung, creating a hole in the lung and *causing a pneumothorax* . . . ." 553 S.W.3d at 831 (emphasis added). In the instant case, the Commonwealth presented no evidence that the pneumothorax Kate experienced was caused by the attack. In fact, the record indicates the contrary.

The EMTs' Patient Care Record identifies nothing suggestive of any reasonable inference that Kate experienced a collapsed lung before she arrived at FRMC. We examined these medical records and found no recordation either of any symptoms or any diagnosis that either of Kate's lungs collapsed before FRMC personnel inserted bilateral chest tubes.

Additionally, a medical record not seen by the jury, but filed in the record shows Kate received emergency treatment for a puncture wound of the left front wall of Kate's thorax (*i.e.*, her upper torso where she pointed when asked where Lamotte stabbed her), but, unlike the assault in *Brown*, Kate's wound was described as superficial **without** *penetration of the thoracic cavity* containing the

lungs.[52]  Other records show Kate's pneumothorax, or collapsed lung, was a chronic condition rather than an acute one caused by a traumatic event.  On March 5, 2017, two days after her attack, nurses prepped Kate for the insertion of a chest tube and, by noon, physicians had successfully treated her "Chronic Pneumothorax."  (First Vol. I, 110, 114.)  Most damning to the Commonwealth's argument that Lamotte caused Kate to suffer a pneumothorax is the sealed record of FRMC's x-ray report confirming Kate had no pneumothorax before FRMC medical personnel inserted bilateral chest tubes.  (Sealed Record, Package 2, [344].)

Because the Commonwealth presented *no* evidence to support the claim of acute pneumothorax caused by a knife attack and no evidence Kate's thoracic cavity containing her lungs was compromised before FRMC's insertion of bilateral chest tubes, we are unpersuaded by this argument.

As further proof Kate suffered a substantial risk of death at the hands of Lamotte, the Commonwealth adds that she was taken "emergently to the operating room."  (Appellee's Br. 12.)  Again, that emergency room was at FRMC and the jury's only insight into what happened there comes from the records of the

---

[52] More specifically, the medical record states "PNCTR W/O FB OF L FRNT WL OF THORAX W/O PENET THOR CAV" or "puncture without foreign body of left front wall of thorax without penetration of thoracic cavity."  (Record, FRMC Coding Summary dated 3/6/2017, p. 1 of 2, filed under seal on 2/28/2020.)

second hospital, UKMC. And the Commonwealth goes on, stating the records that were admitted indicate "the procedure was a 'complex repair' which included ligation of Kate's jugular vein, and the transection of a nerve." (Appellee's Br. 12 (citing "TR II, p. 266" which is also part of Def. Exh. 5).) As made clear above, however, that "complex repair" was UKMC's repair of what occurred at FRMC, and ligation of the jugular vein was a necessary precaution as UKMC physicians conducted that complex repair of FRMC's hypoglossal nerve transection and pharyngotomy. None of that is attributable to Lamotte's actions.

The Commonwealth also says Kate was at risk of death because she "suffered acute respiratory failure, and hemorrhagic shock." (Appellee's Br. 12 (citing "TR II, p. 271" which is also part of Def. Exh. 5).) Paramedic Williams's records and his testimony contradict both. Nothing he said in testimony or wrote in the Patient Care Record indicates any respiratory problems, and he testified Kate was only in the mild form of shock – compensated hypovolemic shock – that never affected her pulse, blood pressure, or other vital signs.

Even when reading all the evidence in a light most favorable to the Commonwealth, the injuries Kate suffered do not justify the inference Lamotte's actions caused a substantial risk of death to Kate. Alternately phrased, the Commonwealth failed to overcome the stringent evidence burden established by

the caselaw and required to support a reasonable inference that Lamotte's actions

and no one else's caused a serious physical injury for purposes of KRS 508.010(1).

     b.  <u>It would be clearly unreasonable for a jury to find Lamotte caused Kate prolonged impairment of health.</u>

The Commonwealth alternatively argues that Lamotte's actions

caused Kate prolonged health impairment. That is not what the evidence tells us.

The Commonwealth's claim that two years after the assault, "Kate still suffered

impairment of her ability to eat and drink" because of what Lamotte did cannot be

supported. (Appellee's Br. 13.) Unquestionably, the evidence shows, as Mother

testified, "during the surgery, they cut the nerve to half of [Kate's] tongue." (VR

1/29/19 at 11:25:20.) That is, during surgery, the medical personnel at FRMC

performed a pharyngotomy and hypoglossal nerve transection that caused Kate to

develop Horner's syndrome of miosis and ptosis, symptoms she did not have

during her transport to the FRMC ER. (Comm. Exh. 81, p. 6 ("Horner's syndrome

. . . likely related to [Kate's] . . . operations.").) Kate's inability to eat or drink is

directly attributable to the heroic emergency treatment performed at FRMC, not to

Lamotte's actions.

     c.  <u>It would be clearly unreasonable for a jury to find Lamotte caused Kate prolonged impairment of any organ.</u>

The Commonwealth also argues Lamotte caused prolonged

impairment of Kate's organs of speech, specifically, "an injury to her vocal cords

that required surgical repair." (Appellee's Br. 13.) But while there is evidence Kate suffered a cut along her cheekbone, there is no indication of a cut near her vocal cords when the EMTs arrived. The only "surgical repair" noted among the evidence was to correct what happened at FRMC.

The Commonwealth also says, "Kate suffered a prolonged impairment of her tongue which is a bodily organ." (*Id.*) Oddly, the Commonwealth seeks to establish that prolonged organ impairment by citing Mother's testimony that "half of Kate's tongue no longer functions." (*Id.*) Again, we note that Kate's tongue was not cut by Lamotte. The Commonwealth should have candidly quoted Mother in full when she told the jury that injury to Kate's tongue happened "during surgery." (VR 1/29/19 at 11:25:20.)

5. *No evidence supports a reasonable inference that Lamotte's actions resulted in Kate's serious physical injury.*

The Commonwealth presented evidence that Lamotte stabbed Kate, and also presented proof Kate suffered pneumothorax, hypoglossal nerve transection, and other injuries that can be called serious in the general, if not the legal and medical senses. However, the Commonwealth failed to present any evidence that the first event (Lamotte's actions) caused the second event (serious physical injury). Instead, the Commonwealth relied on the logical fallacy of *post hoc*, *ergo propter hoc* – that because event A occurred before event B, A caused B. Such logic is never enough to establish causation. *See, e.g.*, *Abbott v. Federal*

*Forge*, 912 F.2d 867, 875 (6th Cir.1990) ("[P]*ost hoc, ergo propter hoc* is not a rule of legal causation.").

If we had looked no further into the record than the evidence of an assault followed by a collapsed lung and repair of a severed tongue nerve, *etc.*, the fallacy of the *post hoc, ergo propter hoc* causation inference would not have been so obvious. It is clearly revealed, however, when we consider all the medical proof: (1) that Kate's thoracic cavity containing her lungs was never penetrated until FRMC inserted bilateral chest tubes, (2) that her prolonged inability to use her tongue fully, to speak and to swallow, occurred during surgery when medical personnel cut her hypoglossal nerve, and (3) that the description of the injuries by the only medical professional who testified, EMT Williams, fell short of "serious physical injury." In context, Williams's testimony was based on his observations prior to Kate's arrival at FRMC. Given all the evidence, we conclude no reasonable jury could have found Lamotte to have been responsible for causing Kate any serious physical injury as our law defines the term.

Lamotte could not be found guilty of first-degree assault pursuant to KRS 508.010(1) by reasonable jurors because the Commonwealth failed to prove every element of first-degree assault. It was error not to grant Lamotte's motions for directed verdict and judgment notwithstanding the verdict on that charge.

### 6. *Lamotte's remaining arguments are moot.*

Our decision reversing the conviction for the foregoing reason makes unnecessary a full review of Lamotte's other two arguments – (1) that proof during trial was insufficient to support a finding beyond a reasonable doubt that he was Kate's assailant[53] and (2) that he was entitled to post-judgment relief based on Kate's perjury when she identified Lamotte as her assailant.[54]  Neither of these arguments is wholly without merit and, should this case lead to a subsequent appellate review, they are arguments deserving of fuller consideration.

---

[53] Reasonable doubt that Lamotte was Kate's assailant might have been found in her original identification of Chase Dugas as her assailant, combined with proof that no one saw Dugas from the time he and his friends fell asleep before sunrise until midday after the attack.  Or, it might have been found in Lamotte's testimony he and Kate had a suicide pact that Kate could not admit lest she risk Mother returning her to institutional psychiatric care.  Naming Dugas first, and then Lamotte, would avoid that.  The Commonwealth believes the jurors' temptations to find reasonable doubt came in the testimony of a forensic expert who "found Kate's DNA on the sweater [Lamotte] was wearing when he was arrested."  (Appellee's Br. 5.)  However, the forensic expert made it reasonably clear she tested for and found Kate's DNA to be only "touch DNA, meaning casual or limited contact DNA[.]"  *Owens v. Commonwealth*, 512 S.W.3d 1, 9 (Ky. App. 2017).  It is unrefuted that Lamotte and Kate hugged that very morning, which could explain how the touch DNA got on his sweater.  When Lamotte's attorney asked the trial court to clarify for the jury, consistently with the forensic witness's testimony, that none of Kate's blood was found on Lamotte, the court declined, stating:  "the test demonstrated the DNA of both the defendant and the victim which seems to me to be adequate for the jury to link those up and to draw the conclusion that there was blood of the victim on the clothing of the defendant . . . ."  (VR 1/29/19 at 4:57:55.)

[54] In April 2019, Kate admitted to three individuals whom she met at her AA/NA meetings, and also posted statements on social media, that Lamotte did not attack her.  In August 2019, at Lamotte's hearing on his CR 60.02 motion, Kate testified against those witnesses, repeated what she said at trial, and claimed not to remember naming Dugas as her assailant.  The circuit court attributed Kate's repeated out-of-court recantations to her then-current state of mind, brought on by mental health issues, drug use, and homelessness, and giving credibility to Kate's sworn testimony at the hearing, which was consistent with her sworn testimony at trial.

-69-

## CONCLUSION

For the foregoing reasons, we reverse the Franklin Circuit Court's April 19, 2019 Judgment and Sentence following a jury trial and remand with instructions to enter an order granting judgment notwithstanding the verdict.

ALL CONCUR.


BRIEF FOR APPELLANT:

Amy Robinson Staples
Shelbyville, Kentucky

Whitney Wallace
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General
Frankfort, Kentucky